Next case for this morning is Village of Belle Rive v. Illinois Central Railroad, number 517-0036, Artie Smith. You may proceed, counsel, for the appellant. Thank you, your honor. May it please the court, counsel. My name is Gary Smith, and I represent Belle Rive in this matter. The court's order below dismissing the complaint ruled that the issues raised in the complaint were within the exclusive jurisdiction of the Illinois Commerce Commission. Now, presumably, this came out of motion to dismiss, presumably the court's ruling with respect to the exclusive jurisdiction of the ICC was relying upon two Supreme Court cases, the 1934 and 1954 Supreme Court cases involving the City of Chicago and railroads within the City of Chicago. Now, those cases essentially held that when the legislature passed the 1914 Public Utilities Act, it took away the municipal powers of municipalities to regulate railroads and railroad crossings. And the court held in those cases that contracts between the municipality and the railroads that predated the passage of the 1914 Public Utilities Act were not enforceable. That the contracts were abrogated and not enforceable. However, that's not the situation we have here, and the trial court's decision relying on those cases, presumptively, and its ruling that the exclusive jurisdiction of the issues raised in the complaint belong at the ICC is an error for several reasons. First of all, the 1914 Public Utilities Act, as the court held in those two Supreme Court cases, took away the municipal powers to regulate railroad crossings because the municipal powers were somewhat coercive. They were regulatory in nature. In this case, this was not an exercise of any police power whatsoever. This was an arm's length transaction between two parties. First of all, we have to look, this is a 1925 contract between Bell Rive and the railroad. Public Utilities Act was passed more than 10 years ago, so certainly the railroad, when it came to Bell Rive, knew about the regulatory nature of the Public Utilities Act and the creation of the Illinois Commerce Commission. Just as a side note, the 1914 Public Utilities Act was repealed in 1921, but then it was reenacted in 1921 to create the Illinois Commerce Commission, which is the regulatory agency we have today. Basically, it took away a body called the Public Utilities Commission, but today we have the ICC. So in 1925, when Bell Rive and the Southern Illinois and Kentucky Railroad are meeting, the railroad has to know that for over 10 years that the regulatory authority of municipalities was gone. Moreover, we have to assume that the parties intended here to enter into a valid and binding contract. Certainly they were not exercising some sort of act of futility. Most importantly here, the 1925 contract is not a regulatory effort by Bell Rive. It was a voluntary, arm's-length agreement between two parties. You see, Bell Rive had at least two things that the railroad wanted. The railroad was not present in Bell Rive, unlike the Chicago cases. Chicago had trains in there, it was regulating railroads at the railroad crossings before 1914. Now we're after 1914, and the railroad comes to Bell Rive, there's no trains in there. And one of the two things that the railroad needed was, it needed permission from Bell Rive to build the railroad through town. There's a statutory requirement that railroads are going to have to get permission to build through town. And that was true in 1925, it's true today. We cited it, 610 ILCS 5-19, subparagraph 5. So they needed permission to build. And the railroad wanted to build basically a north-south line through Bell Rive, and it wanted the city, the village rather, to vacate its streets and alleys at places where the railroad tracks would cross. So Bell Rive granted permission. It says in the 1925 contract, we grant permission, and it vacated those streets and alleys where the tracks would cross. And in exchange for that consideration, the railroad agreed to build and maintain three bridges in Bell Rive at its cost. Now again, this is 1925, after the passage of the Public Utilities Act and the creation of the Illinois Commerce Commission. One of those bridges was at 10th Street, correct? And hasn't the ICC already exercised jurisdiction over the 10th Street Bridge? Your Honor, the ICC has had jurisdiction over the building of the bridges and the railroad crossings from its inception. It was not merely the demolition of that bridge that created any kind of jurisdiction of the ICC. The bridge was demolished first by the railroad, and then they went in after the fact and asked for permission. But the jurisdiction of the Illinois Commerce Commission over the railroad crossings goes back to the 1914 Public Utilities Act and then the creation of the commission in 1921. So presumptively, when the bridges were built originally, the ICC granted permission of the railroad to build the three bridges. So to maintain those bridges, just like they were when they were built, the railroad is obligated to go in and ask regulatory authority to do that. Let me ask you, since you brought up the commission, you are requesting certain relief in your complaint. Correct. Does the Illinois Commerce Commission have the power and jurisdiction to grant that relief? All of it? Parts of it? None of it? What's your position as far as the extent of powers of the commission? Your Honor, the Illinois Commerce Commission is a creature of statute. Like all administrative agencies, its powers are delineated by statute. There are no implied powers of the Commerce Commission. So the complaint, we ask the court to construe the contract, we ask for damages and injunction, and alternatively rescission of the contract. Commerce Commission has no jurisdiction over any of those counts or any of those reliefs whatsoever. Its jurisdiction is solely limited to the crossings. So the issues that were before the circuit court are not issues before the Commerce Commission. The Commerce Commission can't grant rescission. The Commerce Commission has limited powers, and so there was no way that count three, for example, rescission, should have been dismissed, unless the court assumed that the 1925 contract was void. And I say that for this reason. Rescission assumes that there's a valid contract in existence. So if there was a valid contract in existence, the court could have construed it under the declaratory count. But in this case, what the court did is it dismissed the rescission count, and the only way the court could ever have done that would have been to have assumed that the 1925 contract between the parties was void, as exclusively within the jurisdiction of the Commerce Commission, so that there was no contract. So we believe that the court misread the two Chicago cases. Now, if the contract, this is a very important point here, if the contract is void, as within the jurisdiction, because all the issues are within the jurisdiction of the Commerce Commission, well, then that means that Bellrive's permission for the railroad to go through, the whole 1925 contract is void. Bellrive's permission for the railroad to build through the statutory permission that was required to build through town never occurred. And the actions of Bellrive in vacating the streets and alleys where the railroad crossings cross is also void. See, the railroad wants to have its cake and eat it too in this case. It argues that the 1925 ordinance was null and void. It can't be null and void only for purposes of its obligation to build and maintain the three bridges at its cost, and also enjoy the benefits, the contractual benefits of the permission to go through town and the vacation of the streets and alleys. It's either all of one or none of the other, but it can't be a little bit of both. I mean, they can't have it both ways. And we believe that our count does state valid causes of action, and we will ask the court to reverse and remand to give us our hearing before the court. But the judge's order below says that the issues that were raised were within the exclusive jurisdiction of the Commerce Commission, and that inferentially means that the contract was void. If this court affirms that decision, which we vigorously ask you to reverse and remand, but if you were to affirm it, we ask that you clarify that the 1925 ordinance was void, and was void ab initio because the relationship of the parties from here on out, we need to know who has the right-of-way across those streets and alleys, and whether or not there was actual permission granted to the railroad to build through. We don't think that that's the case. The critical reason is that this contract is contingent upon the railroad getting regulatory authority to build and maintain those bridges, and do so at its cost. The Supreme Court cases, the two Chicago Supreme Court cases, the 34 and 54 cases, did not forever bar agreements between railroads and villages. In fact, if anything, it's a policy of the law to encourage settlements. What this agreement is, is it's an agreement that's conditioned upon outside regulatory approval. In a contract, when a promisor makes a promise, and that promise is conditioned upon some outside occurrence, there's a duty of good faith and fair dealing to try to fulfill that condition and that promise in order to complete the contract. Here, the railroad could go to, and has the obligation in our opinion, to go to the Illinois Commerce Commission and say, here's our 1925 contract. We agreed to build and maintain three bridges in Bell Rive at our cost, and they've done the engineering. It's attached to the complaint. Here's the engineering. We ask your approval, Illinois Commerce Commission. Please let us build this according to the terms. They have not done that. They refused to do that. It's certainly what the allegations in the complaint are. And they are contractually obligated to do that. They built the bridges in the first place. But if the contract is void from the beginning, then, you know, all bets are off with respect to the vacation of the streets and alleys and the permission that was given to them to go in there before. But that bridge I asked about, the 10th Street Bridge, is that still there? It is not. And how long has it been gone? I can't recall, Your Honor, several years, but it is in the record. There is an order finding when the railroad demolished it before it got permission from the Commerce Commission. Now, was Bell Rive a party to that proceeding when they got permission? Bell Rive presumptively was a party. I don't know if the village board was ever made aware of it, but its lawyer wasn't aware of it. But even if that order does not preclude the rebuilding of a bridge to fulfill the terms of the contract, just because the wooden bridge was in an unsafe Right now we allege that the bridges are in an unsafe and not passable condition for the public. But in order to fulfill the terms of the contract, the railroad needs to maintain a safe and passable bridge. And if that means putting another bridge in, that's part of their contractual obligation. Certainly they are using the streets and alleys that were vacated by Bell Rive many years ago. Their trains are going up and down the track as well. This was a continuing duty of the railroad to maintain safe, passable bridges. For the obvious public safety reason is that when we sliced the village in two, the condition upon which the village gave permission for the railroad to be there in the first place was so that the public could traverse back and forth on the east and west sides as part of the deal. The railroad in 1925, just as today, they had the power of eminent domain. They did not have to go through Bell Rive. They did not have a right to go through Bell Rive. They needed Bell Rive statutory permission. And they got it and they built it. And now they have to fulfill their part of the deal. And that part of the deal includes maintaining three passable bridges at their cost. And this does not infringe upon the power or authority of the Illinois Commerce Commission. In merger agreements today, there are numerous contracts between parties that will require Department of Justice antitrust approval, FCC communications approval, FERC approval, electric, all those merger agreements between large companies that require federal or regulatory approval are contingent upon obtaining outside approval. That doesn't mean that the contracts are void. So the obligation on the one party is to go to the FCC or the DOJ and present the proposed merger and obtain regulatory approval. And that's the obligation that the railroad undertook here. They undertook the obligation. Everybody knew this was 10 years after the fact, 11 years after the fact, when the contract was entered into. It was a voluntary deal by a railroad that obviously knew or at least is imputed to know the law that railroad crossings are going to require or bridges at railroad crossings are going to require Commerce Commission approval. But the contract isn't void just because the Commerce Commission needs to approve the transaction. It needs to approve the safety and engineering specs over the railroad crossing. Certainly, the railroad is obligated to make an effort to obtain regulatory approval. This isn't much of a complaint. So the complaint seeks to require all three bridges to be rebuilt. The complaint does, that's correct. That's the complaint that we have asked for that relief. If the court ordered that we were entitled only two out of the three, then that would, or really, if the ICC ordered that we were entitled only two out of the three, then that would be the ruling of the ICC. But the complaint asks that the court declare the rights of the parties and the railroad to seek ICC approval to build and maintain those three bridges as part of its contractual obligation with Bell Rock. And we believe that that's the case. The railroad can't get it, can't have the benefits of the contract without also the burdens. This is a post-1914 contract when the parties were well within the knowledge of what they were doing. Bell Rock was not exercising regulatory authority over that railroad crossing. Bell Rock was approached by the railroad because the railroad wanted to build its tracks through Bell Rock. And the railroad could have exercised eminent domain powers, which they had then and they have today, to go around or take another route. They did not have to go there. This was not regulatory. But in the Chicago cases that the Supreme Court held at the Public Utilities Act preempted those pre-1914 cases as regulatory in nature and not enforceable thereafter. So the contingency that we maintain, that the contingency here is that they've got to go get regulatory approval. Another example would be a 99-year lease with a landlord that says he'll maintain the building. And you get so many years into the contract and it needs a new roof or it needs new electrical or whatever, and you've got to get a city permit in order to do the building. The landlord can't say, well, the lease is off because I can't do it. I've got to go get... I can't do the maintenance. I've got to get a permit and I'm not going to get a permit. That's what we have here. The landlord in a 99-year lease who's agreed to maintain the building has to go to the city, the municipality, and present its plans for the upgrade or the putting in a new roof. And with health and safety exercises, the city grants that permission or not. Do I have an opportunity for a rebuttal? Thank you, Brian. Counsel for Appleby. Good morning, Your Honors. I'm Curt Reitz. I'm going to please the Court. I represent Illinois Central Railroad Company in this case. As the Court knows, the trial court, Dojova Street, right down the street, granted Illinois Central's motion to dismiss the plaintiff's claim for lack of subject matter jurisdiction. And we also moved to dismiss these same allegations as it related to the 10th Street crossing because it was barred by a prior judgment of the Illinois Commerce Commission, which had already exercised its jurisdiction over that same bridge nine years ago in 2008 with the participation and without the objection of the village. In fact, the order indicates the village attorney was contacted. Those two arguments work together because the final order of July 16, 2008, closing the 10th Street crossing, provides further evidence, obvious evidence, that the Illinois Commerce Commission has jurisdiction over these three bridges. And the trial court here, Judge Overstreet, acknowledged all of this in his dismissal order, which is not vague or unclear, but which succinctly states the Illinois Commerce Commission has exclusive jurisdiction over the issues raised in plaintiff's complaint and, in fact, has previously exercised that jurisdiction over the 10th Street bridge without objection by the plaintiff. The plaintiff prematurely asked his court to rule on issues prior to seeking relief from the Illinois Commerce Commission. Well, that brings up a good point. There's no question that the Commerce Commission has certain regulatory jurisdiction over these bridges. The question before us is whether it has exclusive plenary jurisdiction. Let me ask you the same question I asked your opposing counsel. Does the Illinois Commerce Commission have authority to grant the relief prayed for in the village's complaint? Yes, sir. All of it? It can grant injunctive relief. It can grant damages. It can cover every argument. Whether they win or lose, it has jurisdiction to determine every argument that's contained in the complaint that the village filed. Is that your position? Two-part answer to that, John. First is that the jurisdiction of the Commerce Commission is exclusive and plenary. It says it by statute. As to what? Exclusive and shall extend to all intrastate and interstate rail carrier operations within the state. The Supreme Court says it's exclusive and plenary. It also covers, in particular, the removal, construction, maintenance, grade crossing separation, and cost of these things. Exclusive and plenary. So, first of all, the ICC covers it. Secondly, we have an ICC lawyer who does not want to go before the Illinois Commerce Commission because I don't believe he's going to like what happens there. They're going to. Nobody can predict what's going to happen. But they're going to rule that a town of 300 people doesn't need three bridges in addition to a highway bridge in a town of 300 people when we're trying to decrease crossings and dangerous intersections in the state of Illinois, not increase them. And he doesn't want to go before the Illinois Commerce Commission, so he's tried to come up with arguments that get around that. But if you look at the Supreme Court cases back in 1934, these same arguments were made in 1934 and again in 1954, and they were rejected. What about the argument that your opposing counsel made? These dealt with matters resolved before the ICC came into existence. The Supreme Court basically said they've been superseded as a practical matter. This is something that was done in 1925, a few years, five years after the existence of the ICC. Yes, sir. It's an interesting question. It's been dealt with. In fact, in 1934, Supreme Court, the ordinance before them contained an amendment to our ordinance that was dated July 15th, 1924. So it was also after 2000. But that was mandatory. That was not the core ordinance. That was part of what was declared was handled in that case. So, first of all, we have an amendment to our ordinance that's already been dealt with in 1934. And then secondly, we have two basic pronouncements that deal with this, again, in Supreme Court opinions, directly on point. It says when the Public Utilities Act came in force on January 1st, 1914, the power of the city over grade separations ceased to exist, and thereafter it could neither pass new nor enforce existing ordinances with reference to matters within the exclusive jurisdiction of the commission. And then in 1954, the Illinois Supreme Court says the same darn thing. It says when the act came into force, the power of the city over grade separations ceased to exist, making the city incapable of passing new ordinances or enforcing existing ordinances with reference to such matters which the act placed within the exclusive jurisdiction of the commission. The core question is, and I don't think you've answered it, can the Illinois Commerce Commission grant injunctive relief? Can it grant damages relief? That's basically what, not the regulatory. There's no question they have a regulatory place in the scheme. But can they grant relief outside of their regulatory powers that is prayed for in the complaint? If they don't, they don't have exclusive and plenary jurisdiction. Of this controversy, they may have of a crossing. They don't have of this controversy because it contains more than a crossing question. Your Honor, two things. One, as it relates to damages, the cost portion clearly covers it. Who's going to pay for this is within the police power of the Illinois Commerce Commission. And that is, let's talk about what happened here. The municipalities had all the power before 1914. They extracted these contracts because of that. In 1914, the Public Utilities Act was passed, and the Illinois legislature, and this is discussed at length in the two cases that resolve this issue, say the legislature held the power, not the municipalities, and the Illinois legislature redirected the police power over crossings to the Illinois Commerce Commission. They did that for safety reasons. And, in fact, the counsel for Bellride wants to make this 2008 crossing closing something over money. It specifically says it was about safety. It specifically says that it's a dangerous crossing. So the police power was delegated to the Illinois Commerce Commission, and they are the exclusive and plenary, and it includes costs. In the 1934 and 54 actions, specifically say that the police power includes the apportionment of costs, which is the damages that you're talking about. To the extent it's an injunction, again, what the attorney for Bellride has tried to do is try to carve his way around it, things which have already been rejected. But, yes, to answer your question, to the extent the Illinois Commerce Commission can order things to be done with regard to these railroads, it's injunctive in nature. They can order us to close a crossing. They can order us to open a crossing. They can order us to build one. And those are the things he's asking for. He's not asking for some kind of protective order that's beyond what the scope of the Illinois Commerce Commission. What he's asking for is to have the court determine a third bridge already closed should be built and paid for by the Illinois Central, clearly part of the Illinois Commerce Commission. He's asking for two other bridges to be rebuilt, clearly part of the Illinois Commerce Commission. And then he's asking for damages for all that, that we should pay for everything, clearly part of the Illinois Commerce Commission. And this agreement can certainly be considered by the Illinois Commerce Commission. I would venture to guess it's going to be in evidence before the Illinois Commerce Commission. And the Illinois Commerce Commission can consider it, just like they did in the City of Chicago cases. Those same things happened. In fact, the City of Chicago, at least they did it the right way there. They went to the Illinois Commerce Commission first, and what happened was they had a 100% agreement. And when they didn't get 100%, they appealed to the civil courts. And the civil courts said, that's not us. The exclusive and plenary jurisdiction of the Illinois Commerce Commission takes care of this, and it includes apportionment of costs. It includes who's going to pay for the damages. Now, it is what it is. And the safety of the police power, I can't emphasize that enough, the statute says it is exclusive. The statute goes on to say it shall have the power to determine and prescribe the manner, including the particular point of the crossing, the terms of installation, operation, maintenance, use, protection, and cost of the crossings. I thought the argument advanced by counsel for the appellant, that it's analogous to a long-term lease. How would you respond to that analogy? It's not analogous to a long-term lease because, again, what we have is the State of Illinois deciding that these contracts, that nobody can make side deals on rail crossings. You and I tomorrow, Your Honor, can't decide, because we own property over a rail crossing, we can't decide it would be a really good idea to build a bridge over that when there's interstate commerce running through it, and hazmat cars, and on and on. There's a government body that decides whether that's safe or advisable. And so it's not like a long-term lease. There's this governing body that governs everything, and even when there's a stipulation between, even if there is a stipulation, this contract, between the Bell Rive and the Illinois Commerce Commission, it's dealt with in the Illinois Commerce Commission rules. It says, here's what the stipulation has to include. The commission, the public authority, that's Bell Rive, the rail carrier, that's us, and I don't. So even when there's an agreement like this, there is a statutory provision that covers it that says the commission has to approve, and only then, all that avoids is the need for an actual evidentiary hearing. It still must be approved. So this is not a long-term lease about a tenant and somebody not fixing a leaky pipe. This is interstate commerce. This is hazmat transportation of cars. This is rail industry that is also there under the virtue of the Surface Transportation Board. And to suggest that a lawsuit down the street here in Mount Vernon is going to somehow bypass all this when it's been rejected again and again and again is wrong, and money would be much better spent on behalf of the village of Bell Rive to be perfectly blunt if they would go to the Illinois Commerce Commission if they don't like the situation and get it dealt with there rather than try to make an end run, and an end run around the obvious jurisdiction of the court and spend time and money and effort trying to avoid the Illinois Commerce Commission. So in plain English, this statute, the police power for the rail crossings is exclusively in the hands of the Illinois Commerce Commission. And if there's any doubt, there's two Illinois Supreme Court cases, 1934 and 1954, that flatly say that, and it says they flatly also go on to say any new ones. And this idea that just because it occurred afterwards is not applicable, the plaintiff has been unable to cite a single case, Your Honors, where somehow pleading injunctive relief got him around, or somehow pleading damages got him around, or somehow pleading something else got him around, every single time, and these two cases frankly deal with 99.9% of it, every single time these arguments have been made, they've been rejected, go back to the Illinois Commerce Commission. And when they go to the Illinois Commerce Commission, we have a town, and this is in the record, at Plaintiff's Exhibit A30, this is their proposed map, and they actually stuck in an 11th Street crossing, because they have already recognized the 10th Street crossing is closed, but the two rail crossings that are here, the 5th Street crossing and the 13th Street crossing, you can see they service one or two houses, and they don't cut off, you can simply go around the block and get to the highway and get across. Now as a practical matter, the Illinois Commerce Commission, when it considers that, may determine that those crossings, to the extent crossings create risk and hazard, may not be necessary anymore. And that's why the Illinois Commerce Commission is in charge of this. That's why two parties can't make a deal, and a private deal outside the Illinois Commerce Commission. So when Judge Overstreet went faced with all this, and went confronted with all this, and confronted with the additional fact that in 2008, in July of 2008, the 10th Street crossing was specifically the subject of an Illinois Commerce Commission order, what does he do? He enters a very common sense order, he puts an end to this, and says that these are things within the purview of the Illinois Commerce Commission, and that the plaintiff has come here prematurely. So if we get ordered to pay for something and we don't pay, maybe he has a cause of action somewhere. It may well be in front of the Illinois Commerce Commission, or it may be in civil court, but that's not what we're here about today. We're here about him trying to say, we are obligated to build three bridges in perpetuity when the Illinois Commerce Commission is now in charge of this. When the police power, the safety of the state of Illinois has required that this be in a commission that takes care of these things, rather than through some private deal. Do the honors have any questions? Thank you. Thank you, Counsel. Thank you, Your Honor. It's abundantly clear here that the railroad does not like the contract that it made in 1925, and it's just trying to get out from under the deal here. The terms of the agreement do not infringe upon the power of the Illinois Commerce Commission. I want to talk about that 10th Street Bridge for a moment. The case of Mississippi Fuel, which we've cited in our brief, does not bar, it's not race judicata. There is not race judicata against the Illinois Commerce Commission. There's a legion of cases on it. The Commerce Commission can make a decision in a regulatory nature, and then later on can change its mind. The decision that it made in 2008 with respect to the 10th Street Bridge does not forever preclude relief from Bell Ride. Excuse me. What about the opposing counsel's argument that the powers of the Illinois Commerce Commission in regards to ordering an action done and allocating costs covers basically the relief you're seeking in your complaint? Well, I was going to get to that, Your Honor. Thank you. Clearly, the Commerce Commission has the limited authority over the railroad crossings. That's what the statutory authority is. That's what the case law holds. With respect to the allocation of costs, the 1934 case does preempt the regulatory authority of the pre-1914 cases, and it does say that afterwards, and the statute provides, that the Commerce Commission can assess costs for the building of railroad crossings, not just bridges. But it can assess those costs. It has that authority, no question about it. But this is a contract. This is not infringing on the Commerce Commission's authority. This is a contract that the railroad made here. They said, we'll pay for those costs. They have an obligation under contract to go before the Commerce Commission and say, we'll pay. Now, if for some reason the Commerce Commission assessed costs against Bell Ride, Bell Ride, it's like a contract of indemnity. The railroad has promised that they will pay for that. That's part of the consideration for the deal that they got for the vacation of the streets and alleys and statutory permission to run their line through the village of Bell Ride. Now, he made a comment that a little town of 300 doesn't want to go, they'd be better off going to the ICC to seek this relief. Well, the problem is, they contractually obligated themselves to do that. They, the railroad, built the bridges. They, presumptively, got permission from the ICC to build those bridges. As I said, this is like a condition where you have to go out and get regulatory approval in order to do something. They're duty bound, good faith and fair dealing to go to the Commerce Commission and offer to pay for building the three bridges. They claim that the town of 300 doesn't need three bridges, but they contractually obligated to try to get permission to build those three bridges. That's the deal that was made in exchange for the vacation of the streets and alleys and going through town. The Commerce Commission can't pay damages. The Commerce Commission cannot grant rescission. Again, they're arguing that this ordinance, this contract of 1925 is void. If it's void, it's void for all purposes. Those streets and alleys were never vacated. The city still has the rights of way to go right across those streets and alleys. It brings some chaos, but we need a ruling from this court or the circuit court with respect to the rights of the parties under this contract because they involve land rights, they involve rights of way rights from here on out. There's no question that the Commerce Commission does have the authority to assess costs, but they've agreed to indemnify Bellrive for that. We ask that the court reverse and remand this case for our hearing and trial before the circuit court or at least, if you affirm it, which we think would be in error, but declare that the contract is void then it's void for all purposes so that we can then proceed with respect to the rights of the parties and the rights of way in the village itself. Thank you. Thank you. The court will take the matter under advisement and issue a decision in due course.